**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

KING LEFLORE
ADC #133845                                                         PLAINTIFF/COUNTER-DEFENDANT

V.                                    5:09CV00143 SWW/JTR

CYNTHIA REED, CO-II,
Varner Super Max ADC; and                                   DEFENDANT/COUNTER-CLAIMANT
RODERICK JOHNSON, Lieutenant,
Varner Super Max ADC                                                                       DEFENDANT

**PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**

**INSTRUCTIONS**

The following recommended disposition has been sent to United States District Judge Susan Webber Wright. Any party may serve and file written objections to this recommendation. Objections should be specific and should include the factual or legal basis for the objection. If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection. An original and one copy of your objections must be received in the office of the United States District Clerk no later than fourteen (14) days from the date of the findings and recommendations. The copy will be furnished to the opposing party. Failure to file timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the United States District Judge, you must, at the same time that you file your written objections, include a "Statement of Necessity"

that sets forth the following:

1. Why the record made before the Magistrate Judge is inadequate.

2. Why the evidence to be proffered at the requested hearing before the United States District Judge was not offered at the hearing before the Magistrate Judge.

3. An offer of proof setting forth the details of any testimony or other evidence (including copies of any documents) you desire to introduce at the requested hearing before the United States District Judge.

From this submission, the United States District Judge will determine the necessity for a hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

> Clerk, United States District Court
> Eastern District of Arkansas
> 600 West Capitol Avenue, Suite A149
> Little Rock, AR 72201-3325

## I. Introduction

On May 15, 2009, Plaintiff King LeFlore ("LeFlore"), initiated this § 1983 action against Defendants Cynthia Reed ("Reed"), Roderick Johnson ("Johnson"), Varner Supermax Assistant Warden John Whaley ("Whaley"), and Arkansas Department of Correction Chief Deputy Director Ray Hobbs ("Hobbs"). (Docket entry #2). On June 3, 2009, LeFlore filed an Amended Complaint requesting that his claims against Defendants Whaley and Hobbs be dismissed. (Docket entry #6). On July 13, 2009, the Court entered an Order voluntarily dismissing Plaintiff's claims against Defendants Whaley and Hobbs. (Docket entry #11).

LeFlore's pleadings allege that, on August 24, 2008, while he was incarcerated in Varner Supermax ("VSM"), Reed used excessive force against him and Johnson failed to protect him from

Reed's attack. On August 13, 2009, the Arkansas Attorney General filed an Answer on behalf of Johnson. (Docket entry #28). On September 8, 2009, Reed, who was forced to resign from the Arkansas Department of Correction ("ADC") for her misconduct in connection with the incident giving rise to this lawsuit, field a *pro se* Answer. (Docket entry #37).

On December 14, 2009, Reed filed a *pro se* Counterclaim alleging that LeFlore committed the tort of battery when he dashed her with urine shortly before she allegedly used excessive force against him. (Docket entry #53).

On July 7, 2010, the Court conducted an evidentiary hearing on LeFlore's claims against Reed and Johnson and Reed's Counterclaim against LeFlore. LeFlore and Reed appeared *pro se* and Johnson was represented by Assistant Attorney General Renae Ford Hudson. All of the parties stipulated to the admissibility of their respective exhibits. Thus, at the beginning of the hearing, the Court admitted into evidence LeFlore's Exhibits A through E and G through L; Johnson's Exhibits 1 through 7; and Reed's Exhibits 1 through 4. During the evidentiary hearing, the Court admitted into evidence, without any objections from LeFlore or Reed, Johnson's Exhibits 8 though 10.

The Court heard testimony from LeFlore, Reed, Johnson, and former VSM Warden Grant Harris. The following findings of fact are based on that testmiony and the parties' Exhibits.

## II. Findings of Fact

**A. Background**

1.  LeFlore testified that he voluntarily requested to be transferred to VSM because it offered him better educational courses and job training programs than those available at the Brickeys Unit. In responses to questions from the Court, LeFlore denied that he was transferred to VSM for any disciplinary problems at the Brickeys Unit.

2.      Former VSM Warden Grant Harris testified that LeFlore has a long history of disciplinary violations in the ADC. (Df. Johnson's Ex. 8). On February 1, 2008, LeFlore was transferred from the maximum security area of the Brickeys Unit to VSM to evaluate whether he should be placed in VSM's behavior modification program. On February 6, 2008, it was decided that he should be placed in the general population of the Varner Unit.

3.      Mr. Harris testified that, on March 17, 2008, LeFlore attacked a female guard at the Varner Unit and punched her twice in the face. He was immediately reassigned to VSM and placed in its behavior modification program. As a result of this attack, 2nd degree battery charges were filed against LeFlore in Lincoln County Circuit Court. Those charges remain pending.

4.      Mr. Harris made it clear that prisoners can not request to be voluntarily placed in VSM. According to Mr. Harris, VSM houses the most aggressive, difficult to control, and dangerous prisoners in the ADC.

5.      The Court finds that LeFlore flatly lied in testifying that he had no disciplinary problems while he was incarcerated in the Brickeys Unit and that he voluntarily requested a transfer to VSM to take advantage of its superior educational and job training programs.

**B. The August 8, 2008 Incident**

6.      In 2008, Reed worked as a guard in VSM, and held the rank of Correction Officer II LeFlore was assigned to cell 666, on the third tier of cell block 6. On August 8, 2008, Reed delivered a food tray to LeFlore's cell. She noticed LeFlore had covered the lights and windows in his cell. She ordered him to remove the items covering his lights and windows. He refused to obey her order and she told him she would have to issue a disciplinary if he did not comply with her order. According to Reed, LeFlore cursed her and warned her that, if she wrote him up for a disciplinary,

he would "get her." She then left to deliver food trays to other prisoners.

7. LeFlore, still angry over Reed's threat to write a disciplinary, decided to flood his cell with water. Johnson, who held the rank of Lieutenant and was the shift leader in cell block 6, responded to a call reporting that LeFlore had flooded his cell. Johnson handcuffed LeFlore and took him to isolation. Reed later wrote a disciplinary charging LeFlore with: (1) refusing to obey her direct order to remove the items covering his lights and windows; and (2) flooding his cell. Reed testified that, if LeFlore had not flooded his cell, she would *not* have written a disciplinary for his failure to obey her order to remove the items covering his lights. LeFlore was convicted of both charges and lost telephone and other privileges for thirty days.

## C. The August 24, 2008 Incident

8. At approximately 10:30 a.m. on August 24, 2008, Reed opened the slot in LeFlore's cell to deliver his lunch tray. This was the *first contact* she had with LeFlore since the August 8, 2008 incident. She asked LeFlore if he was "okay" about the earlier incident. According to Reed, LeFlore replied: "Yeah, I've still got lots of love for you." She took this to mean everything was "cool" between them. She would soon discover that LeFlore was still angry over the August 8 incident and that he planned to attack her for writing the disciplinary.

9. During the evidentiary hearing, Assistant Attorney General Hudson used LeFlore's deposition to cross-examine him. In his deposition, LeFlore admitted that, when he saw Reed on August 24 he was still angry about the August 8 incident, and planned to carry out his earlier threat to "get her" for writing the disciplinary. He admitted that, "twenty to thirty minutes" before Reed returned to pick up the food tray on August 24, he urinated in a styrofoam cup and placed it next to the cell door below the slot for the food tray. He planned to use this urine to dash Reed when she

returned to pick up his food tray.

10. During the evidentiary hearing, LeFlore testified that he urinated in the cup only about "five minutes" before Reed returned to pick up his food tray. The Court views this discrepancy to be of little importance, other than to further demonstrate LeFlore's tendency to shade the truth.. Regardless of the time differential, LeFlore had clearly planned a way to "get" Reed for the August 8 incident by dashing her with urine when she returned to pick up his food tray.

11. At approximately 11:00 a.m., Reed returned to LeFlore's cell to pick up the food tray. He handed the tray to her and she placed it on the cart. When she turned around to close the food tray slot, LeFlore stuck his hand through the slot and dashed her in the face with the cup of urine. According to Reed, the urine hit her square in the face and went into her mouth, eyes, and down the front of her shirt.

12. According to Reed, LeFlore then grabbed her arm or shirt and pulled her toward the cell door. She discharged pepper spray through the food tray slot to force LeFlore to release her. LeFlore has *not* asserted any claims against Reed for spraying him with pepper spray. Thus, the Court need not address this use of force by Reed.

13. According to Reed, she immediately radioed for help and then walked toward the Main Control Room, which is located approximately 100 yards from LeFlore's cell. She passed Johnson in the hallway and told him that LeFlore had dashed her with urine and that she was going to the Main Control Room to shower and change clothes. Johnson testified that Reed's face was wet and glistening, the front of her shirt was wet, and she was crying.

14. Johnson arrived at LeFlore's cell and handcuffed him, with his hands behind his back. Johnson took LeFlore's left elbow and began escorting him to Isolation 4. The doorway to Isolation

4 is a short distance past the Main Control Room. Thus, Johnson and LeFlore were required to walk past the Main Control Room to get to Isolation 4.

15.     LeFlore testified that some of the pepper spray was in his eyes and he was having difficulty seeing. Nevertheless, he testified that, when he and Johnson got within about 25 yards of the Main Control Room, he could see Reed sticking her head out of the women's restroom, inside the Main Control Room, and watching him. Johnson confirmed this testimony by LeFlore.

16.     According to LeFlore, when he and Johnson reached the Main Control Room, Reed came outside in her uniform pants and a white T-shirt. She approached him cursing loudly and, when she got within two or three feet, she swung and hit LeFlore once with her right fist and once with her left fist. LeFlore stated that these two blows landed on his left and right jaw and that both blows were struck by Reed with her *fist closed*. It is undisputed that when Reed struck LeFlore his hands were cuffed behind his back. According to LeFlore, at the time Reed struck him, he posed no physical threat to her and her attack was unprovoked and clearly unconstitutional. He also testified that, after striking him twice, Reed spit in his face.

17.     LeFlore further testified that Johnson should have known Reed planned to attack him and moved to prevent it. LeFlore admitted the attack began and ended within a few seconds. He also provided *no facts* to explain how Johnson should have anticipated the attack from Reed or how he could have intervened any sooner to stop it after it started.

18.     Reed and Johnson's testimony about what took place at the Main Control Room differs with LeFlore's testimony in a number of important respects. Reed testified that she was crying because she did not understand why LeFlore had dashed her. When she left the Main Control Room, she did *not* plan to attack or hit LeFlore. She only wanted to find out from him why he had

7

dashed her. She denied cursing LeFlore. She admitted using a loud voice as she approached LeFlore and asked him why he had dashed her. In response to her question, LeFlore responded: "I told you I was going to get you, bitch." According to Reed, she impulsively slapped him for his degrading remark. She believed she struck him with the right palm of her hand and the back of her right hand. She was not sure if those blows landed on his face or head. She adamantly denied hitting LeFlore with her fist. She admitted spitting at LeFlore but she believed she either missed him or her spit landed on his shirt.

19. Reed also testified that, just before she struck LeFlore, he appeared to try to jerk away from Johnson. She suggested that LeFlore might have been trying to get close enough to her for a "head butt." The Court does not find this testimony from Reed to be credible. She did *not* mention LeFlore trying to jerk away from Johnson in the Incident Report, which she completed shortly after the incident. (Df. Reed's Ex. No. 1). Similarly, immediately after the incident, Johnson sent Reed a letter notifying her that, in *slapping* LeFlore, she had violated two ADC regulation: AD-00-10 Section (21) "Maintain a courteous and professional demeanor;" and Subsection D "Unnecessary and excessive force." (Df. Johnson's Ex. No. 1). In describing the incident, Johnson's letter does *not* mention LeFlore trying to jerk away from him or LeFlore otherwise posing a threat to Reed before she struck him. Finally, on September 11, 2008, VSM Assistant Warden John Whaley conducted an "Employee Hearing" to evaluate Reed's conduct during the incident. Whaley heard a statement from Reed about the incident. In his report to Warden Harris, Whaley did *not* mention Reed contending that LeFlore tried to jerk away from Johnson or that LeFlore posed any physical threat to her when she struck him. (Df. Johnson's Ex. No. 2). Whaley found that Reed had acted in a discourteous and unprofessional manner and that she had used "physical abuse . . . to punish or

harass" in violation of ADC regulations. He recommended to Warden Harris that Reed's employment with ADC be terminated. On September 15, 2008, Reed submitted a letter of resignation "in lieu of termination." (Johnson's Exhibits Nos. 3 and 4). The Court finds that Reed's anger overcame her training and she wantonly and intentionally struck LeFlore twice with her open palm to punish him for dashing her and taunting her when she asked him to explain his actions.

20. Johnson testified that he is 6'5" tall and weighs 360 pounds. LeFlore is approximately 5'8" tall and weighs approximately 165 pounds. Reed testified that she is 5 feet tall and weighs 135 pounds.

21. Johnson testified that, when he and LeFlore got close to the Main Control Room, Reed exited the rear door and approached them. She used a loud voice to ask LeFlore why he had dashed her with urine. Johnson testified that LeFlore pulled his left elbow from Johnson's right hand, pivoted to face Reed, and answered Reed's question with words to the effect of "because I told you I would get you bitch." Johnson unequivocally testified that LeFlore was *not* posing any threat to Reed when he turned to face her. As soon as LeFlore made that remark, Johnson testified that Reed slapped LeFlore on the left and right side of his forehead with her right and left palms. Johnson was unequivocal in stating that Reed used her open palm to slap LeFlore and that she did not strike LeFlore with a closed fist. Johnson testified that, while Reed did spit at LeFlore, he was unsure whether the spit hit LeFlore. After the incident, Reed returned to the Main Control Room and Johnson escorted LeFlore to Isolation 4, where he was allowed to take a shower to wash off the pepper spray.

22. According to Johnson, Reed's two slaps happened suddenly and without warning. During the four previous years Reed had worked at VSM, she testified she had never used force or

violence against an inmate. Johnson indicated that he has worked with Reed for one year in Cell Block 6 and had never seen or heard of her using force against a prisoner. Johnson said he was shocked and surprised when Reed suddenly slapped LeFlore and spit at him. He made it clear that the incident happened so fast and was so unexpected that it was over before he could react.

      23.      LeFlore testified that the two blows to his face did not cause any bleeding, swelling, or bruising. After the incident, LeFlore was seen by LPN Tamala Thompson. Her notes refer only to LeFlore having been sprayed with pepper spray and do *not* mention that he had been slapped or punched in the face. She noted that LeFlore "voiced no complaints" and no "signs of distress [were] noted." (LeFlore's Ex. No. K).

      24.      During her cross-examination of LeFlore, Assistant Attorney General Hudson read into the record the following portions of LeFlore's deposition in which he was asked to describe the physical injuries he suffered as a result of Reed's attack:

> Q: So you've told me that you got punched in your face twice and that she spit on your clothes, on the outside. What did you actually go through? What physical injury? I don't know, so what physical injury of being punched two — twice in the face by a woman?
>
> A: It was — well, if we going to state the physical injury.
>
> Q: Please.
>
> A: This is what I'm going to say. I'm not going to — I'm not going to say that — I'm not going to say that I filed for the physical injuries. You know, matter of fact, I ain't even going to say that due to the fact that I didn't put it on my grievances.
>
> Q: All right, let me stop you. So you're not — this lawsuit is not about physical

injuries to you.

A: No, just about the injury to my rights.

Q: So you don't disagree with me that you didn't have any physical injuries.

A: No.

\* \* \*

Q: Okay. So you are — you don't have any physical injury. So you're suing because an officer hit you?

A: Well, yeah, yes I am. I'm suing because it was done intentionally and maliciously.

25.    The Court finds that Reed slapped LeFlore once with each hand. The Court also finds that these two slaps probably landed in the area of LeFlore's forehead and caused some fleeting pain but no other physical injury. These findings are supported by the following objective evidence that is not in dispute:

(a) Reed is a small woman who is not physically capable of delivering a very hard blow.

(b) LeFlore admitted that the blows Reed landed did not cause any swelling, bruising, or bleeding. This is much more consistent with the results of a slap than a blow struck with a fist.

(c) When LeFlore was examined by a nurse, shortly after the incident, he did not complain about having been slapped or punched in his face. The nurse also did not note any bruises or marks on LeFlore's face or head. Again, this evidence strongly suggests that Reed struck LeFlore with an open hand.

(d) Finally, in his deposition, LeFlore admitted that he was only interested in vindicating his constitutional rights, rather than pursuing damages for any physical injury he sustained from Reed's attack.

26. The Court finds there was no "objective need" for Reed to use *any force* against LeFlore and that LeFlore was posing no threat to her when she struck him. However, Reed did "temper" her use of force by striking LeFlore with only her open hand and she limited her attack to two slaps. While LeFlore may have had a small amount of momentary pain from the two slaps, he sustained no other physical injuries. Nevertheless, the Court must find that Reed's use of force was unnecessary, wanton, and intentional. Similarly, Reed spitting on or at LeFlore was, at best, unprofessional and brought Reed's conduct almost down to LeFlore's level in dashing her with urine.

27. A prison guard's use of *any force* against a prisoner, who is handcuffed and unable to protect himself and is posing no threat to the guard, is always a matter that must be taken seriously by the Court. In this case, only Reed's small stature, coupled with her decision to strike LeFlore with her open hand, prevented LeFlore from suffering a potentially serious injury. Reed's conduct, if allowed to stand unpunished, would set a terrible precedent by suggesting that guards, who are the victims of attacks by prisoners, can take matters into their own hands and later inflict the punishment of their choosing on prisoners who are in handcuffs and no longer posing any threat. Four decades ago, in *Holt v. Sarver*, 309 F. Supp. 362 (E.D. Ark. 1970), Judge Henley exposed the horrors of Arkansas's state prison system, which allowed guards and trustees to punish prisoners, as they saw fit, using medieval techniques. He correctly described that system as a "dark and evil world." *Sarver*, 309 F. Supp. at 381.

28.     The ADC has made great progress in the years since Judge Henley rendered his landmark decision in *Sarver*. Warden Harris' prompt decision to terminate Reed for her misconduct is a testament to that progress.

29.     These findings by the Court do not mean that it lacks sympathy for Reed's situation. Until this incident, she had an excellent record at VSM and had never been charged or disciplined for using excessive force against a prisoner. On August 24, she found herself dashed in the face with urine and she did not understand why. She was rightfully upset by LeFlore's barbaric conduct. When she asked him to explain why he did it, he taunted and demeaned her by saying "I told you I was going to get you bitch." Nevertheless, prison guards must be able to restrain the urge to take matters into their own hands and use force to punish and retaliate against prisoners who are no longer posing any threat to them. Those who are not capable of exercising that restraint should not be prison guards.

30.     While LeFlore has proven that Reed used excessive force against him in violation of his rights under the Eighth Amendment, he has not established that he is entitled to any compensatory damages. At most, LeFlore had some fleeting pain from the two slaps. In his deposition, he admitted that he had no other physical injuries from the slaps and that he was only interested in vindicating his constitutional rights. Accordingly, the Court finds that LeFlore should be awarded nominal damages of one dollar ($1.00) against Reed for her use of excessive force against him.

31.     The Court finds that LeFlore's failure to protect claim against Johnson is without merit. There are simply no "objective" facts which support the proposition that, when Reed walked toward LeFlore, Johnson should have somehow anticipated that she posed a substantial risk of harm

to LeFlore. Reed is a small woman and she was not carrying mace, a billy club, or any other weapon. Johnson had worked with her for the last year before the incident and he had never seen her use force against a prisoner or display any violent tendencies. Thus, objectively, there was *nothing* to suggest that Johnson posed a substantial risk of harm to LeFlore. Likewise, there are no facts which support the proposition that, "subjectively," Johnson knew that Reed posed a substantial risk of harm to LeFlore and Johnson disregarded that risk. There was simply no way for Johnson to know that, when Reed exited the Main Control Room, she might attack LeFlore. In fact, when Reed exited the Main Control Room, the Court does not believe Reed intended to attack or strike LeFlore. It was only when LeFlore taunted her and called her a "bitch" that Reed snapped and spontaneously slapped LeFlore twice and spit at him. This attack could not have been anticipated by Johnson and it was over so fast that it did not give Johnson a chance to intervene. Thus, LeFlore has failed to prove any of the essential elements of his failure to protect claim against Johnson.

32.     In her Counterclaim, Reed alleges that, when LeFlore dashed her with urine, he committed the tort of battery. Under Arkansas law, a tortfeasor is liable for battery if: (1) he acts with the intent to cause some harmful or offensive contact with a person; and (2) a harmful or offensive contact occurs. AMI Civil 418 (2009). In his testimony, LeFlore *admitted* that he urinated in a cup and then intentionally threw the cup of urine in Reed's face. The Court finds that this admitted conduct by LeFlore satisfied both of the essential elements of the tort of battery.

33.     Reed testified that, after being dashed by LeFlore, she went to the emergency room of the Jefferson County Regional Medical Center. A physician told her that, since she had already received a hepatitis B shot, the urine would not expose her to any other health related problems. She testified that, since being dashed, she has had vision problems which she believes may be related

to getting urine in her eyes. She also testified that she has reoccurring nightmares of LeFlore dashing her with urine and LeFlore attacking her. Reed admitted that prisoners in VSM frequently attempt to dash guards with urine and feces and that she received training in how to avoid being dashed. In electing to work as a prison guard in VSM, Reed knew that getting dashed was an occupational hazard of her job. Finally, the Court must also take into consideration Reed's own misconduct in the incident, which is a relevant factor in evaluating her damages. Considering the totality of the circumstances, the Court finds that Reed should be awarded two hundred and fifty dollars ($250.00) in damages against LeFlore for his battery.

### III. Conclusions of Law

34.     To prevail on an Eighth Amendment excessive force claim, a prisoner must demonstrate that a guard used force "maliciously and sadistically to cause harm," rather than in "a good-faith effort to maintain or restore discipline." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992); *Jones v. Shields*, 207 F.3d 491, 495 (8th Cir. 2000); *see also Whitley v. Albers*, 475 U.S. 312, 322 (1986) (holding that the evidence must support a "reliable inference of wantonness," and not "a mere dispute over the reasonableness of particular use of force or the existence of arguably superior alternatives"). The relevant factors that must be considered when making this determination are: (1) the objective need for the force; (2) the relationship between the need and the amount of force used; (3) the threat reasonably perceived by the defendants; (4) any efforts by the defendants to temper the severity of their forceful response; and (5) the extent of the inmate's injuries. *Johnson v. Hamilton*, 452 F.3d 967, 972 (8th Cir. 2006); *Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002).

35.     In *Jones v. Shields,* 207 F.3d 491, 495 (8th Cir. 2000), the Eighth Circuit suggested

that a prisoner could not prevail on an excessive force claim if he suffered only a *de minimus* injury. However, in *Wilkins v. Graddy*, 130 S. Ct. 1175, 1178-79 (2010), the Court specifically rejected the *de minimus* injury rule, and held that the extent of the injury is only one factor to be considered when resolving the "core judicial injury" of "whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *See also Williams v. Jackson*, 600 F.3d 1007, 1012 (8th Cir. 2010) (holding that "the extent of any resulting injury, while material to the question of damages and informative as to the likely degree of the force applied, is not in an of itself a threshold requirement for proving" an excessive force claim).

36. To prevail on a failure to protect claim, a prisoner must prove that: (1) objectively, there was a substantial risk of serious harm; and (2) subjectively, the defendants knew of and disregarded that substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 838 (1994) (holding that "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."); *Young v. Selk*, 508 F.3d 868, 872 (8th Cir. 2007); *Lenz v. Wade*, 490 F.3d 991, 995-996 (8th Cir. 2007) (explaining that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference"); *Johnson v. Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006).

37. Consistent with the foregoing conclusions of law, the Court finds that: (1) LeFlore proved by a preponderance of the evidence that Reed used excessive force against him in violation of his rights under the Eight Amendment; (2) LeFlore failed to prove by a preponderance of the evidence either the "objective" or the "subjective" elements of his failure to protect claim against Johnson; and (3) Reed proved by a preponderance of the evidence that LeFlore committed the tort

of battery when he threw a cup of urine in her face.

IT IS THEREFORE RECOMMENDED that:

1. LeFlore be awarded a Judgment against Reed in the amount of one dollar ($1.00), representing nominal damages for Reed's violation of LeFlore's constitutional rights.

2. Reed be awarded a Judgment against LeFlore in the amount of two hundred and fifty dollars ($250.00) as damages for LeFlore's battery against her.

3. A Judgment be entered in favor of Johnson on LeFlore's failure to protect claim.

Dated this 12th day of July, 2010.

_____
UNITED STATES MAGISTRATE JUDGE